*Eastern Shore Title Company v. Steven J. Ochse, et al.*, No. 16, September Term, 2016. Opinion by Getty, J.

**TORTS — NEGLIGENCE — DAMAGES — COLLATERAL LITIGATION DOCTRINE** — Maryland follows the "American Rule," which provides that the costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages. However, the American Rule is not an absolute bar and, in Maryland, the collateral litigation doctrine is an exception to the American Rule. The collateral litigation doctrine permits the recovery of attorney's fees incurred by the plaintiff where the wrongful acts of a defendant involved the plaintiff in litigation with others and made it necessary to incur expenses to protect his or her interest, and such costs and expenses should be treated as legal consequences of the original act.

**TORTS — NEGLIGENCE — DAMAGES — COLLATERAL LITIGATION DOCTRINE — ELEMENTS** — If a plaintiff incurred litigation expenses, then the plaintiff may recover collateral litigation expenses as damages by demonstrating that such expenses were the natural and proximate consequence of the injury complained of, were incurred necessarily and in good faith, and were a reasonable amount.

**TORTS — NEGLIGENCE — DAMAGES — COLLATERAL LITIGATION DOCTRINE — CALCULATION OF DAMAGES** — To calculate damages in a negligence action based on the collateral litigation doctrine, the trial court is permitted to take judicial notice of the attorney's fees and litigation costs incurred as a result of the original litigation, and use those fees and costs as a measure of damages in the collateral litigation lawsuit.

**TORTS — NEGLIGENCE — DAMAGES — COLLATERAL LITIGATION DOCTRINE — CONTRACTUAL FEE-SHIFTING PROVISION** — A plaintiff may only recover collateral litigation expenses as damages in a negligence cause of action if the plaintiff actually incurred the attorney's fees. Thus, if the plaintiff recovered the collateral litigation expenses pursuant to a contractual fee-shifting provision, then the plaintiff cannot also recover those same attorney's fees under a collateral litigation doctrine theory of damages.

Circuit Court for Talbot County
Case No. 20-C-10-007315
Argued: October 6, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 16

September Term, 2016

---

EASTERN SHORE TITLE COMPANY

v.

STEVEN J. OCHSE, ET AL.

---

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Getty,
Battaglia, Lynne A.
　　(Senior Judge, Specially Assigned),

JJ.

---

Opinion by Getty, J.

---

Filed: May 31, 2017

"The long and winding road
that leads to your door
Will never disappear
I've seen that road before
          * * *
But still they lead me back
to the long winding road . . ."

The Beatles, *The Long & Winding Road* (Apple Records 1970).

In this case, the long and winding road virtually disappeared and, more regrettably, went undetected during the title search for the 2001 sale of a five-acre residential lot in Dorchester County. Eastern Shore Title Company ("ESTC"), Petitioners and Cross-Respondents, conducted the title search for Mr. Steven Ochse and Ms. Shari Ochse ("the Ochses"), Respondents and Cross-Petitioners, when they purchased the lot from Mr. William Henry and Ms. Jessie Henry ("the Henrys").

However, vestiges of the road leading to the Ochses' door were evident in the physical remains of a gravel roadbed. To further compound the confusion, an outline of the roadbed was documented on the Henrys' subdivision plat[1] but was mistakenly designated as a "driveway." In the course of improving the property, a landscape contractor advised the Ochses about his suspicions that the gravel roadbed was more than just a "driveway." After further investigation, the Ochses filed their initial lawsuit to quiet title against the Henrys ("the Henry litigation").

---

[1] Land Records of Dorchester County, Plat Cabinet M.L.B. 46, p. 108B.

After residing on the property for approximately seven years, the Ochses finally learned during the Henry litigation that the "driveway" encumbrance bisecting their lot was actually part of a thirty-foot-wide strip of land, which had been granted in fee simple determinable to Dorchester County by a 1919 deed for the purpose of making a new county road. Thereafter, the Ochses' melancholy ballad took a long winding road through Maryland's appellate courts (*see E. Shore Title Co. v. Ochse*, No. 0999, 2015 WL 9590716, at \*1 (Md. Ct. Spec. App. 2015); *Ochse v. Henry*, 216 Md. App. 439 [hereinafter *Ochse 2*], *cert. denied*, 439 Md. 331 (2014); *Ochse v. Henry*, 202 Md. App. 521 (2011) [hereinafter *Ochse 1*], *cert. denied*, 425 Md. 396 (2012)); but still it leads them back to this Court on issues of the collateral litigation doctrine and the collateral source rule.

The underlying case to this appeal is a lawsuit collateral to the Henry litigation that was filed by the Ochses on June 25, 2010 in the Circuit Court for Talbot County against Chicago Title Insurance Company ("Chicago Title")[2] and ESTC, the title examiner, in which the Ochses alleged that ESTC breached the contract intended to benefit the Ochses and was negligent in its title examination. The trial court found in favor of the Ochses and, as a result, awarded them compensatory damages for their litigation costs and expenses, including a $215,710.60 judgment against ESTC and Chicago Title, which was the amount of the attorney's fees awarded to the Ochses in the Henry litigation.

---

[2] We note that Chicago Title Insurance Company ("Chicago Title") is not a party to this appeal and did not join Eastern Shore Title Company ("ESTC") in the appeal to the Court of Special Appeals, *E. Shore Title Co.*, 2015 WL 9590716, at \*1.

ESTC and Chicago Title thereafter moved to alter or amend that judgment, pointing out that the Henrys had already paid the attorney's fees awarded in the Henry litigation. The trial court granted that motion and reduced its judgment against ESTC and Chicago Title by the full $215,710.60—the amount of attorney's fees that the Ochses had already recovered from the Henrys in the Henry litigation. The Ochses and ESTC appealed the case to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals remanded the case for a determination of whether the collateral litigation doctrine applied and to clarify the attorney's fees award. *E. Shore Title Co.*, 2015 WL 9590716, at *18, *21.

ESTC petitioned this Court for a writ of certiorari, and the Ochses filed a cross-petition. We granted both the petition and the cross-petition on May 20, 2016. *E. Shore Title Co. v. Ochse*, 448 Md. 29 (2016). We hold that, in order to recover attorney's fees against a negligent title searcher using the collateral litigation doctrine theory of damages, the plaintiff must show that the title searcher's negligence proximately caused the plaintiff to file a necessary collateral action, resulting in the plaintiff incurring reasonable litigation costs or expenses necessarily and in good faith, and that the plaintiff has not otherwise received compensation for those costs and expenses. Thus, we reverse the judgment of the Court of Special Appeals, and affirm the judgment of the trial court.

# Background

## A. *Factual Background*

The underlying facts and procedural paths of this case and the collateral case have been thoroughly described in three appellate opinions. *See E. Shore Title Co.*, 2015 WL 9590716, at *1; *Ochse 1*, 202 Md. App. at 521; *Ochse 2*, 216 Md. App. at 439. We restate the facts that are relevant to this appeal, all of which are uncontested.

*1919 County Road Deed*

The elusive 1919 county road deed was executed on March 2, 1919, and was recorded on May 27, 1919 among the Land Records for Dorchester County Maryland in Liber W.H.M. 6, folio 332. A total of fourteen property owners conveyed portions of their land to Dorchester County to create a thirty-foot-wide strip of land, "for the purpose of making a new county road." According to the deed, the strip of land had been "marked out, partly cut out and opened."[3] Dorchester County thus acquired a fee simple determinable interest in the strip of land.[4] However, the deed included a reversionary

---

[3] At trial, Ms. Ochse testified that the road was a "gravel run," and Mr. Ochse testified that the road had "a thin amount of stone, laid down and you could see that there was occasional access over it."

[4] The deed described the public county road as follows:

[B]eginning at a bridge over a branch called "Miles Branch", the said branch being at that point the line of division between Caroline County and Dorchester County, Maryland, and from thence in an even width of thirty feet over the course heretofore surveyed by Richard Dixon, formerly road engineer for Dorchester County, as laid down by said engineer, over and through the lands of [Grantors] to what is called the "New Ferry Road" leading from the bridge at Harrison's Ferry to Finchville . . . being located in the Fork or Election district No. 1 of Dorchester County, Maryland, the said

clause, which stated that "if the [county road] is abandoned by the said County Commissioners of Dorchester County, or their successors in interest, the lands hereby conveyed shall revert back to the said grantors, their heirs and assigns, so far as the same are within the bounds of the lands of the respective grantors heretofore mentioned."

*Chronology of Pertinent Property Interests*

One of the fourteen property owners was Henry B. Messenger, who held title to approximately 150 acres of land in this vicinity south of Federalsburg.[5] Over the years, portions of Mr. Messenger's property were conveyed to various property owners. Of significance to this litigation, one of those conveyances—Mr. Messenger's conveyance on August 30, 1966 of two parcels to the Mayor and Council of Federalsburg for conservation efforts along Marshythorpe Creek, which adjoined his property—referenced two plats that

road and the said strip of land hereby conveyed being thirty feet wide its entire length[.]

[5] By deeds recorded on October 29, 1902, November 21, 1914, and March 17, 1916. Land Records of Dorchester County, Plat Cabinet Liber C.L. 27, folio 205; Plat Cabinet Liber W.L.R. 8, folio 202; Plat Cabinet Liber W.H.M. 2, folio 31.

Subsequently, Mr. Messenger was delinquent in tax payments, and a tax sale of his property took place by a deed dated November 23, 1929. However, the following year, the property sold at the tax sale was conveyed back to Mr. Messenger by a deed dated June 17, 1930. Land Records of Dorchester County, Plat Cabinet Liber C.L. 25, folio 9; Plat Cabinet Liber C.L. 69, folio 250.

5

depict a roadway labeled as a "county road" within the vicinity of Mr. Messenger's remaining property (the "1966 plats").[6]

Subsequently, a thirty-five-acre parcel of the Messenger property was conveyed on June 29, 1972 by Esther White Messenger[7] to R.T.R., Inc.  On March 18, 1987, R.T.R., Inc. conveyed the same property by deed[8] to the Henrys.  This thirty-five-acre parcel ultimately purchased by the Henrys included the county road owned by Dorchester County as referenced in the 1919 deed and 1966 plats.

In 1998, the Henrys subdivided this parcel to create a lot of approximately five acres that included the county road, known as 2890 Mowbray Creek Road, Federalsburg.[9]  Then, on September 13, 2001, Mr. and Ms. Ochse entered into a contract with the Henrys to purchase the subdivided parcel of land for $325,000.00 (the "Contract of Sale").  The Contract of Sale, which was in the standardized form of a Maryland Residential Contract of Sale, provided that "[t]itle to the Property . . . shall be good and merchantable, free of liens and encumbrances except as specified herein."

---

[6] The plats and deed were recorded among the Land Records of Dorchester County in Liber P.L.C. 149, folio 129 (Sheet 1), Liber P.L.C. 149, folio 130 (Sheet 2), and Liber P.L.C. 149, folio 131.

[7] H.B. Messenger, Jr., and his wife Esther White Messenger held title to the thirty-five-acre parcel as tenants by the entireties.  Land Records of Dorchester County in Liber P.L.C. 174, folio 603.  H.B. Messenger, Jr. died on May 11, 1965.  *Id.*

[8] The deed was recorded among the Land Records of Dorchester County in Liber P.L.C. 243, folio 743.

[9] The subdivision plat was recorded among the Dorchester County Land Records, Plat Cabinet M.L.B. 46, p. 108B.

Significantly to this appeal, the Maryland Residential Contract of Sale, signed by the parties, contained a standard form fee-shifting provision, which stated:

> In any action or proceeding between the [Ochses] and the [Henrys] based in whole or in part, upon performance or no performance of the terms and conditions of this Contract, including, but not limited to, breach of contract, negligence, misrepresentation or fraud, the prevailing party in such action or proceeding shall be entitled to receive reasonable attorney's fees from the other party as determined by the court arbitrator.

The Contract of Sale further specified that "[t]he [attorney's fees] provision . . . shall survive closing and shall not be deemed to have been extinguished by merger with the deed."

*Ochse Property Title Search*

The Ochses received a policy of title insurance from Chicago Title, which guaranteed and represented that the Ochses' property title was precisely as depicted in the 1998 subdivision plat. As an agent of Chicago Title, and for the benefit of the Ochses, ESTC performed the title search, prepared a title insurance binder and drafted the deed. It is uncontested that the Ochses were the customers of ESTC and dealt directly with ESTC. The title search and title insurance binder were intended to "permit [the Ochses] to make an informed decision whether to proceed with the purchase."[10]

---

[10] Steven J. Ochse, et ux. v. Chicago Title Insurance Co., et al., Case No. 20-C-10-007315, Docket No. 160 (Circuit Court for Talbot County June 12, 2013) (memorandum opinion and judgment).

7

*Closing on the 2890 Mowbray Creek Road Property*

On December 14, 2001, at a real estate closing conducted by the general manager of ESTC, Veronica Wainwright, the Ochses acquired as tenants by entireties, via deed,[11] a fee simple interest in 2890 Mowbray Creek Road. The Ochses' deed included a provision (the "driveway provision") indicating that their property interest was "SUBJECT, HOWEVER, to the rights of others legally entitled to the use of a 'Driveway', for purpose of ingress, egress and regress, over [the Ochse Property]."

At a subsequent trial proceeding, the Ochses testified that they asked Ms. Wainwright about the meaning of the provision's language during the closing, and that she verbally advised the Ochses that the driveway provision referred to utility easements, with the utility companies being the unidentified "others" in the provision.[12]

*Discovery of Ochses' Property Title Defect*

After residing at the property for four years, the Ochses hired a contractor in 2005 to undertake significant renovations and landscaping to their home. Based upon an inquiry from the contractor and prior to finalizing the renovation plans, Ms. Ochse reviewed the property deed to determine whether the gravel roadbed could be removed and contacted ESTC for clarification. In response to Ms. Ochse's questions, ESTC performed a second title search. This second title search again failed to uncover the 1919 county road deed.

---

[11] The deed was recorded among the Land Records of Dorchester County in Liber M.L.B. 468, folio 385.

[12] Ms. Wainwright testified that she did not so advise the Ochses.

Based on this second attempt, ESTC offered a new theory that the "driveway provision" in the Ochses' deed was not for utility easements, as originally represented to the Ochses at closing, but instead a right-of-way for the benefit of the Henry property. ESTC offered to prepare a release for the Henrys' signature to quitclaim any and all rights and eliminate the driveway provision from the Ochses' deed. However, when presented with the draft release, the Henrys would not agree to sign it or to relinquish their claims to any right-of-way over the Ochses' property.

The Ochses subsequently wrote a letter to their title insurer, Chicago Title, alerting the insurer to the presence an "undisclosed right of-way" that they contended ESTC had either "failed to pick up on" during the course of the title search, or failed to list in their Owners Policy. In the letter, the Ochses requested that Chicago Title "initiate a claim on [their] behalf against Eastern Shore Title Company." Chicago Title denied the claim, referring to a portion of the Ochses policy that excepted from coverage "easements . . . and other limitations" shown on the 1998 subdivision plat. The Ochses subsequently retained an attorney who continued to pursue obtaining a release from the Henrys, but without success.[13]

### B. Procedural History

*The Henry Litigation*

Consequently, on December 11, 2007, the Ochses filed a complaint against the Henrys in the Circuit Court for Dorchester County ("the circuit court") seeking reformation

---

[13] During the course of these further conversations with the Henrys, the Ochses' counsel was alerted to the possibility that a public road may exist on the property. The

of their deed and for declaratory, injunctive, and related relief. The Ochses sought damages for breach of contract, breach of special warranties, and fraud in the inducement based on the driveway provision in their deed.

Thereafter, on February 22, 2008, seven years after purchasing the 2890 Mowbray Creek Road property, the Ochses finally learned of the true legal status of the gravel roadbed—which up until that time they had presumed was, as stated in their deed, a driveway within property which they owned and over which some others merely had rights-of-way—when an attorney representing the Henrys mailed a letter to the Ochses' counsel revealing the existence of the 1919 county road deed, and Dorchester County's ownership of the county road. Then, the Henrys' attorney mailed a second letter to the Ochses' counsel stating that the Ochses' only remedy was to petition Dorchester County to convey the county road to the Ochses and that any judgment against the Henrys was fruitless because they could not deliver title for the roadbed to the Ochses.

Instead, on April 11, 2008, the Ochses filed an amended complaint, in which they added Dorchester County as an interested party defendant, while maintaining the same claims as in their earlier complaint: reformation of the deed, declaratory relief, injunctive relief, and damages for breach of contract, breach of special warranties, and fraud in the inducement. The amended complaint requested the circuit court to remove the driveway provision from the Ochses' deed, and to declare that Dorchester County did not have a fee

---

Ochses then contacted Dorchester County to determine if a nearby road ending in Caroline County extended onto their property, and were informed that Dorchester County was not responsible for that road.

simple interest in the county road. The Henrys thereafter filed a counterclaim seeking an award of attorney's fees pursuant to the fee-shifting provision of the Contract of Sale that specifically survived merger with the deed.

On May 13, 2008, Dorchester County filed an answer to the Ochses' amended complaint and asserted its fee simple interest in the county road. On August 4, 2008, Dorchester County filed a motion for summary judgment asserting that there was no dispute of material fact regarding Dorchester County's ownership of the county road, including that portion of it described as a "driveway" in the Ochses' deed. Dorchester County asserted that it did not abandon, convey away, or otherwise dispose of its interest in the county road. On October 29, 2008, after a hearing, the circuit court granted Dorchester County's motion for summary judgment declaring that Dorchester County owned the thirty-foot-wide strip of land in fee simple.

The circuit court subsequently held a two-day bench trial, on May 26 and 27, 2009, as to the surviving claims made in the Ochses' amended complaint, as well as the Henrys' counterclaim for attorneys' fees pursuant to the fee-shifting provision in the Contract of Sale. Ultimately, in a written opinion and order entered September 18, 2009, the circuit court denied relief to the Ochses, "conclud[ing] that the [Contract of Sale] merged into the deed and that there was no breach of the special warranties of title." *Ochse 1*, 202 Md. App. at 528. The circuit court, however, granted the Henrys' counterclaim, and

11

subsequently, in a supplemental order entered on October 20, 2009, awarded the Henrys $100,020.00 in attorney's fees[14] to be paid by the Ochses.

The Ochses appealed all of the circuit court's judgments to the Court of Special Appeals. *Ochse 1*, 202 Md. App. at 521. The Ochses also filed a petition with the County Council for Dorchester County, requesting that the county close, abandon, and convey to them the portion of the county road lying across their property.[15] *E. Shore Title Co.*, 2015 WL 9590716, at *6. Following court-ordered mediation before the Court of Special Appeals, the parties filed a consent motion to stay proceedings before that court pending the disposition of the petition by Dorchester County. After that petition was granted through a bill passed by the Dorchester County Council, "the county conveyed its interest in the 30-foot wide strip to the Ochses" through a quit-claim deed.[16] *Ochse 1*, 202 Md. App. at 525. Dorchester County was then dismissed from the Court of Special Appeals case.

---

[14] The parties stipulated at trial that the attorney's fees were reasonable.

[15] Oddly, at this juncture Chicago Title retained counsel to represent the Ochses in the petition. *E. Shore Title Co.*, 2015 WL 9590716, at *6 n.10. Chicago Title took the position that Dorchester County's ownership of the driveway was a matter covered under their title insurance policy. *Id.* As previously noted, Chicago Title had previously refused to represent the Ochses in any litigation against the Henrys, and would not reimburse the Ochses for attorney's fees incurred in that litigation, taking the position that the litigation against the Henrys was prompted by the 1998 plat's implication of a driveway that had been disclosed to the Ochses or by the Ochses' own choice. *Id.*

[16] The Quit Claim Deed was recorded among the Land Records of Dorchester County in Liber D.L.P. 996, folio 468.

The Court of Special Appeals then proceeded to review the circuit court's judgments to deny the Ochses' breach of contract, breach of special warranties, and fraud in the inducement claims, and to grant the Henrys' attorney's fees counterclaim. The intermediate appellate court determined that the circuit court did not err in its conclusions that the Henrys had neither breached the special warranties of encumbrance or of title, nor fraudulently induced the Ochses into entering the Contract of Sale. *Id.* at 530-42. But, the Court of Special Appeals also determined that there was a mutual mistake between the Henrys and Ochses and, therefore, the Contract of Sale did not merge into the deed, "and the Ochses should have been able to sue on the contract." *Id.* at 542-43.[17] The intermediate appellate court held, however, that the central issue underpinning the Ochses' suit against the Henrys based upon the Contract of Sale—the issue of clear title to the Ochses' property—had been "resolved" by the successful petition to the Dorchester County Council and resultant quitclaim deed to the thirty-foot wide strip of land to the Ochses. *Id.* at 543.

As to the issue of attorney's fees, the Court of Special Appeals held that, despite its finding that there was a mutual mistake of fact that prevented the Contract of Sale from merging into the deed, "the circuit court was acting within the terms of the contract and deed by awarding attorney's fees," because "[r]egardless of whether the contract merged with the deed, the attorney's fees provision of the contract survived." *Id.* at 544. But, the

---

[17] The Court of Special Appeals held that the Ochses had not pleaded a claim of mutual mistake at the trial level, but nevertheless had preserved that claim for appellate review by arguing it orally during the trial proceedings before the Circuit Court for Dorchester County. *Id.* at 542.

Court of Special Appeals felt that, in light of its holdings, the apportionment of legal fees to the Henrys was in error. *Id.* The intermediate appellate court explained that "at the time of the conveyance [of the 2890 Mowbray Creek Road property], the Henrys did not convey marketable title to the Ochses, breaching the [Contract of Sale]." *Id.* Therefore, the Court of Special Appeals vacated the attorney's fees award to the Henrys and remanded the case to the circuit court. *Id.*

The Court of Special Appeals' holdings in *Ochse 1* that the fee-shifting provision survived and the Henrys' had breached the Contract of Sale meant that the Ochses were the "prevailing party" in the litigation and, pursuant to the fee-shifting provision, entitled to "receive reasonable attorney's fees from the other party." *See id.* at 526 n.2 (noting that "[b]ecause the [Contract of Sale] contained an attorney's fees provision, the Ochses are entitled to attorney's fees," and that even though the title issues had been resolved in favor of the Ochses through the county petition process, the circuit court "must view the case as it appeared when initiated" in issuing that award). Consequently, after the case was remanded to the circuit court, the Ochses filed, on January 24, 2012, a motion requesting attorney's fees to be awarded in the amount of $333,354.00 for the attorney's fees incurred through the litigation to that point. *Ochse 2*, 216 Md. App. at 449. On April 27, 2012, the Ochses filed a supplemental motion for fees that reflected the additional costs incurred in their certiorari petition to this Court,[18] which revised the total to $355,731.78. *Id.*

_____

[18] The petition for a writ of certiorari was denied on April 23, 2012. *Henry v. Ochse*, 425 Md. 396 (2012).

14

On July 16, 2012, the circuit court issued an order and opinion granting attorney's fees to the Ochses. *Id.* The circuit court explained that, because the Ochses had "prevail[ed] on some issues in [the] case but [did] not prevail on other issues," it had concluded that a "proportionate award" was appropriate. *Id.* at 453. Specifically, the circuit court noted that "the substantial majority of the time in trial and litigation effort put forth by [the Ochses] addressed the issue of willful fraud," an issue on which they did not prevail in their appeal in *Ochse 1*. *Id.* at 453. The circuit court concluded that the appropriate "proportionate award" was "the entirety of the post-trial and appeal costs, as well as one-fourth of the attorney's fees expended in trial." *Id.* at 454. Therefore, starting from the Ochses' initial request of $333,354.00, the circuit court deducted $114,731.40 (its calculation of three fourths of the attorney's fees through the trial), as well as $2,912.00 (which it determined to be a double entry in the Ochses' motion for fees), to reach an award of $215,710.60. In its opinion and order, the circuit court made no mention of the Ochses' April 27, 2012 supplemental motion for fees. *Id.*

The Ochses again appealed to the Court of Special Appeals—this time challenging the rationale of the circuit court's judgment concerning the award of attorney's fees. *Id.* at 449. The Court of Special Appeals rejected the Ochses' claim that they were entitled to the full amount of fees claimed pursuant to the "common core of facts" doctrine, under which a court may award "a fully compensatory fee where an attorney may not have prevailed on each and every claim or defense but still has achieved excellent results." *Id.* at 459. The intermediate appellate court noted that it had previously recognized that the "common core of facts" doctrine "comports with Maryland law," but had not held that its

15

application was mandatory. *Id.* at 467 (discussing *Weichert Co. of Md. v. Faust*, 191 Md. App. 1 (2010), *aff'd on other grounds*, 419 Md. 306 (2011)). The Court of Special Appeals noted that the circuit court "did not view the Ochses' first appellate victory as an excellent result" and held that the circuit court "was free to consider," as part of its overall determination as to attorney's fees, "the thin relationship between the Ochses' appellate success and the thrust of their efforts at trial." *Id.* at 468-69. The Court of Special Appeals therefore held that the circuit court did not abuse its discretion in using its "proportionate award" approach to calculate attorney's fees instead of relying on the "common core of facts doctrine." *Id.* at 469. However, the Court of Special Appeals remanded the case for the circuit court to correct computational errors and to consider the Ochses' supplemental motion for fees, which the circuit court had overlooked. *Id.* On remand, the circuit court recalculated its award for attorney's fees and awarded a total of $228,771.89 in attorney's fees to the Ochses.

*ESTC Litigation*

While the Henry litigation was still progressing through the courts, the Ochses filed a complaint against ESTC and Chicago Title on June 25, 2010 in the Circuit Court for Talbot County ("the trial court"). In that complaint, the Ochses alleged breach of contract against Chicago Title, and breach of contract, negligence, and negligent misrepresentation against ESTC, all stemming from the improper preparation of the Ochses' deed and failure to discover the 1919 deed. The Ochses subsequently filed an amended complaint on July

16

29, 2011 that added negligence and negligent misrepresentation claims against Chicago Title.

The case proceeded to a four-day bench trial beginning on July 9, 2012. At that trial, the circumstances surrounding the faulty title search were revealed. William Price was the title abstractor who performed the title search on the property at 2890 Mowbray Creek Road on behalf of ESTC. Mr. Price testified that he searched deeds in the chain of title back to 1902, and that, in his title abstract forwarded to ESTC settlement staff, he had alerted ESTC to the possible existence of a right-of-way running through the property. However, Mr. Price also testified that he had reviewed the 1966 plats in the Ochses' chain of title that noted a "county road" but found them not pertinent to his title search, and had skipped a search of the Grantor Index forward from 1902 that he conceded would have uncovered the 1919 deed that showed the existence of a county road on the property. The Ochses presented expert testimony that, under the circumstances, the 1919 deed should have been discovered and disclosed to the Ochses.

At the conclusion of the Ochses' case, the trial court granted a motion for judgment on behalf of both Chicago Title and ESTC as to the negligent misrepresentation counts, finding that they were barred by the statute of limitations. Then, on June 12, 2013, the trial court issued a memorandum opinion and judgment as to the remaining claims in the case. The trial court began that opinion by tracing what it described as the "peculiar and extraordinary route" of the litigation stemming from the failure to detect the 1919 county road deed and the 30-foot wide public road running across the 2890 Mowbray Creek Road property prior to the Ochses' purchase of that property. The trial court first summarized

17

the course of the Henry litigation before the Circuit Court for Dorchester County, in which the Ochses had pursued declaratory relief against the Henrys and Dorchester County to gain clear title to the 30-foot wide strip of land. The trial court then described the ESTC litigation pending before it, in which the Ochses pursued breach of contract and negligence claims against ESTC and Chicago Title for failing to alert the Ochses to the presence of the county road across the 2890 Mowbray Creek Road property, a failure that the Ochses alleged caused them to have incurred significant attorney's fees in the Henry litigation to obtain clear title to their property.

As to the specific claims before it, the trial court concluded that Chicago Title could not be held vicariously liable for any negligence of its title searcher agent, ESTC, and therefore dismissed the negligence count against Chicago Title. However, the trial court found in favor of the Ochses as to all remaining counts. The court determined that Chicago Title breached its contract with the Ochses because "Chicago Title refused to act or provide a defense" during the initial course of the Henry litigation, as well as because "Chicago Title, through its agent [ESTC] failed to address the unresolved 'driveway' issue." The trial court also held that ESTC was negligent because it had "breached the standard of care in its title examination" by not discovering the 1919 county road deed and that, even though the county road was not in use at the time of the Henry litigation, that breach was "significantly damaging" to the Ochses, as the cloud in title would have been a major constraint on their ability to sell or develop the property. Finally, the trial court concluded that ESTC's failure to discover the 1919 deed had also breached its contractual obligation

18

to the Ochses to prepare the title search and title insurance binder so that the Ochses' could make an informed decision as to whether to purchase the property.

Turning to the issue of damages, the trial court determined that the Ochses were not entitled to noneconomic damages, but awarded economic damages based upon the attorney's fees and costs the Ochses had incurred. The trial court entered judgment for the breach of contract claims against Chicago Title and awarded $471,947 to the Ochses for that claim, which the court broke down into $256,237.35 in expenses in the case before it, as well as $215,710.60 in attorney's fees for the Henry litigation. The trial court also entered judgment for the breach of contract and negligence claims against ESTC, and awarded $215,710.60 to the Ochses as to those claims. The $215,710.60 amount was, as the court noted, the amount that the Circuit Court for Dorchester County had determined that "the Ochses were entitled for the Henry litigation." Although relying on that amount, the Circuit Court for Talbot County also stated that the judgment from the Circuit Court for Dorchester County was at that time on appeal, implicitly recognizing that the amount was subject to change.

On June 18, 2013, ESTC and Chicago Title filed a motion to alter or amend the judgment and a motion to stay enforcement, seeking a clarification that the damages would be reduced by any recovery made by the Ochses in the Henry litigation. ESTC and Chicago Title attached the Henrys' motion to record satisfaction of money judgment filed in the Henry litigation on June 13, 2013, documenting that the Henrys had paid $218,901.89 to

the Ochses.[19]  On June 28, 2013, the trial court granted ESTC and Chicago Title's motion and reduced the judgment in the instant case against both ESTC and Chicago Title by the $215,710.60 paid by the Henrys in the Henry litigation.  As a result, the judgment against ESTC was reduced to $0.00, and the judgment against Chicago Title was reduced to $256,237.35. [20]  The trial court's order stated:

> Assuming the motion is approved by the Circuit Court for Dorchester County in the Henry litigation, the judgments in the instant litigation will be reduced [or otherwise satisfied] against Chicago Title and ESTC by $215,710.65. While presently the "satisfaction" would satisfy the judgment amount against ESTC as of the judgment date, i.e. June 12, 2013, that is subject to change due to the ongoing appeal by plaintiffs of the attorney's fees award in the Henry litigation.  The Henrys understand, and defendants in the instant case should also, that ". . . any additional fees assessed pursuant to the August 8, 2012 appeal would constitute a supplemental judgment."

> The Court will enter the orders for clarification of the judgments against Chicago Title and ESTC, reducing each judgment by the amount of recovery in the Henry litigation.

---

[19] Although unclear from the record, the difference between the $218,901.89 amount paid and the $215,710.60 judgment likely reflects post-judgment interest.  *See* Maryland Rule 2-604 ("a monetary judgment shall bear interest at the rate prescribed by law from the date of entry"); Maryland Rule 11-107 (providing that, generally, "the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment").

[20] In the four-day trial before the Talbot County circuit court, the Ochses introduced into evidence the contract appointing ESTC as an agent of Chicago Title that was in effect at the time of the title insurance search conducted by ESTC in this case.  That contract contains a provision that ESTC "shall be liable to and agrees to indemnify [Chicago Title] for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from . . . [e]rrors and/or omissions in the abstracting or examination of title by [ESTC] or [ESTC's] employees and/or subcontractors . . ."  Thus, even though the judgment against ESTC was reduced to $0.00, it may still be liable to Chicago Title for some or all of the remaining $256,237.35 judgment assessed against Chicago Title through its agency agreement.

(Footnote and citation omitted.)

The Ochses and ESTC appealed the trial court's judgment to the Court of Special Appeals. *E. Shore Title Co.*, 2015 WL 9590716, at *1. In an unreported opinion, the Court of Special Appeals remanded the case to the trial court to determine whether the collateral litigation elements were satisfied and to determine whether the collateral source rule applied. *Id.* at *2. The Ochses and ESTC petitioned this Court for a writ of certiorari, which this Court granted. 448 Md. 29 (2016). We have rephrased their questions.[21]

ESTC presents the following question for our review:

1. Does the collateral litigation doctrine permit a party to recover their attorney's fees as "damages"?

The Ochses raise the following questions for review:

1. Did the Circuit Court for Talbot County err in its calculation of damages awarded pursuant to the collateral litigation rule?

2. Does the collateral source rule apply to an award of attorney's fees as damages when they are awarded pursuant to the collateral litigation doctrine?

## II
## Discussion

[21] ESTC's question presented was "May a party recover their attorney's fees for the exact same matter more than one time as 'damages', even in separate cases?"

The Ochses presented two questions:

1. Did the trial court and the Court of Special Appeals err in the legal standard used to determine the correct amount of the damages awarded pursuant to the collateral litigation rule for legal expenses incurred?

2. Does the collateral source rule apply to an award of damages for the breach of two separate contracts involving different parties under different circumstances in different courts, where separate consideration was paid for each contract?

21

### A. *Standard of Review*

The standard of review for a non-jury trial is governed by Maryland Rule 8-131(c), which states:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

### B. *Collateral Litigation Doctrine*

The first issue this Court is asked to decide is whether the collateral litigation doctrine applies. In their briefs and at oral argument, ESTC and the Ochses focused on the proximate cause element of the collateral litigation doctrine.[22] ESTC asserts that the collateral litigation doctrine does not apply in this case because the Ochses did not present sufficient evidence to support the necessary elements for the collateral litigation doctrine, specifically that ESTC's negligence proximately caused the Henry litigation. The Ochses respond that the collateral litigation doctrine does apply, and permits attorney's fees to be used as a measure of damages. The Ochses contend that ESTC's professional negligence

---

[22] This is likely because the Court of Special Appeals remanded this issue to the trial court to make a factual determination on the record of whether ESTC's wrongful conduct proximately caused the Ochses to initiate litigation against the Henrys, and if that conduct did, to what extent that litigation related to the injury caused by ESTC.

forced them into litigation with the Henrys to reform their property deed, which satisfies the proximate cause element of the collateral litigation doctrine.

The trial court found that ESTC was negligent in exercising its duty of care to the Ochses, which arose from the contractual relationship between Chicago Title, ESTC, and the Ochses. In *100 Investment Ltd. Partnership v. Columbia Town Center Title Co.*, 430 Md. 197 (2013), this Court held that a title company owes a duty of care, in tort, when conducting a title search. However, the issue of how to measure damages in the negligence action was not before the Court.

A plaintiff in a negligence cause of action has the burden to demonstrate "1) that the defendant was under a duty to protect the plaintiff from the injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Hamilton v. Kirson*, 439 Md. 501, 523-24 (2014) (quoting *Taylor v. Fishkind*, 207 Md. App. 121, 148 (2012)). Consequently, a trial court cannot award damages to a plaintiff unless the plaintiff shows that he or she suffered an actual injury.

The Ochses' theory of damages was that ESTC should be liable for the attorney's fees from the Henry litigation pursuant to the collateral litigation doctrine. In the trial court, the Ochses also sought "non-economic damages related to stress and other maladies." However, the trial court considered these damages as "wildly speculative and not consistent with the purely financial issues of the case." The Ochses do not challenge this finding on appeal.

23

When attorney's fees are sought by a party, then "[o]ur basic point of reference when considering the award . . . is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010)). The American Rule is rooted in "common law reaching back to at least the 18th century." *Id.* (citing *Arcambel v. Wiseman*, 3 U.S. 306 (1796)).

Maryland follows the American Rule. *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445 (2008); *Friolo v. Frankel*, 403 Md. 443, 456 (2008); *see also St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 344-46 (1990) (tracing the history of the American Rule). However, in Maryland, there are four exceptions to the American Rule, and an award for attorney's fees is permitted (1) where a statute allows for the recovery of attorney's fees; (2) where the parties to a contract have an agreement regarding attorney's fees; (3) where the wrongful conduct of a defendant forces a plaintiff into litigation with a third party; or (4) where a plaintiff in a malicious prosecution action can recover damages from the defense of the criminal charge. *Hess Constr. Co. v. Bd. of Educ.*, 341 Md. 155, 160 (1996). The third exception is pertinent to this case, and is commonly known as the collateral litigation doctrine.

The collateral litigation doctrine permits Maryland courts to award legal expenses as damages from a separate litigation against another party that was caused by the wrongful acts of the defendant. *Empire Realty Co. v. Fleisher*, 269 Md. 278, 286 (1973). The

24

collateral litigation doctrine was explained by this Court in *McGaw v. Acker Merrall &*
*Condit Co.*:

> The general rule is that costs and expenses of litigation, other than the usual
> and ordinary Court costs, are not recoverable in an action for damages, nor
> are such costs even recoverable in a subsequent action; but, where the
> wrongful acts of the defendant has involved the plaintiff in litigation with
> others, or placed him in such relations with others as make it necessary to
> incur expense to protect his interest, such costs and expense should be treated
> as the legal consequences of the original wrongful act.

111 Md. 153, 160 (1909); *see also St. Luke Evangelical Lutheran Church, Inc.*, 318 Md. at

345-46 ("[A]ttorney's fees may be awarded when . . . the wrongful conduct of a defendant

forces a plaintiff into litigation with a third party."); *Kromm v. Kromm*, 31 Md. App. 635

("The allowance of such expenses manifestly was grounded on the fact that the wrong there

complained of had imposed a *necessary obligation* upon the plaintiff to institute the

collateral action[.]"), *cert. denied*, 278 Md. 726 (1976).

Collateral litigation expenses are only recoverable "for legal services in a separate

litigation against another party[,] which the wrongful act of the defendant had required,"

and not the legal services rendered in the instant litigation. *Freedman v. Seidler*, 233 Md.

39, 47 (1963). A plaintiff may recover collateral litigation expenses as damages by

demonstrating that such expenses were the natural and proximate consequence of the injury

complained of, were incurred necessarily and in good faith, and were a reasonable amount.

*See Fowler v. Benton*, 245 Md. 540, 550 (1967).

In this case, the Ochses are seeking to recover the attorney's fees from a separate

litigation, the lawsuit against the Henrys. The trial court found that the Ochses sufficiently

demonstrated that the wrongful act of ESTC, the negligent title search, required the Henry

25

litigation and that the attorney's fees were a natural and proximate consequence of ESTC's negligence. The trial court found that ESTC's title search was negligent because the Ochses' deed included a drafting error by including the "12-foot driveway" that "ESTC questioned but never resolved." The trial court found that "ESTC never came up with the 1919 deed, even though they [twice] searched the title, the first such search of the chain of title went back to 1902. Internal memoranda of ESTC noted the concerns in December, 2005, but were not conveyed to the Ochses or their representatives." Additionally, the trial court found that ESTC incorrectly advised the Ochses that the driveway language related to "utility easements," when "the driveway was actually found to be part of the 30' public roadway." Consequently, the trial court found that the wrongful act of ESTC required the Henry litigation because eventually there would have been an issue with the Ochses' title, "particularly when the Ochses went to sell the property," and the county road "greatly limited the Ochses' use, development, marketability, and merchantability of the property."

Therefore, we hold that a remand on the issue of proximate cause is not necessary, because the trial court found that ESTC's negligence required the Henry litigation in which the attorney's fees were incurred. However, our analysis does not end here. We still must determine whether the Ochses have established the remaining elements of their negligence cause of action, based on the collateral litigation doctrine, against ESTC. Specifically, we must determine whether the Ochses "suffered actual injury or loss." *Kirson*, 439 Md. at 523-24 (quoting *Taylor*, 207 Md. App. at 148). This consists of a two-part inquiry: 1) In determining the Ochses' damages in this negligence action, did the trial court properly calculate the attorney's fees incurred by the Ochses in the Henry litigation? and 2) Did the

26

trial court properly consider the Henrys' satisfaction of those attorney's fees to offset the Ochses' damages? We shall address each of these questions in turn.

## C. Calculation of Attorney's Fees

Next, we must determine whether the trial court, in determining the Ochses' damages in their negligence action against ESTC, properly calculated the attorney's fees incurred by the Ochses in the Henry litigation. The Ochses assert that the damages were improperly calculated because the trial court took judicial notice of the attorney's fees awarded in the Henry litigation instead of independently calculating the attorney's fees based upon the evidence submitted by the Ochses in the instant case. The Ochses also state that the lodestar method of calculating attorney's fees should have been used, and that they should have been awarded a higher amount of attorney's fees. ESTC asserts that the damages awarded were unreasonable and improper. In the alternative, ESTC contends that the trial court was permitted to consider the Henry litigation because the entire record was admitted as evidence in the instant case by stipulation. The trial court found that the attorney's fees in the Henry litigation were incurred necessarily and in good faith, and that the fees were reasonable. We hold that the trial court did not abuse its discretion in equating the attorney's fees incurred by the Ochses in the Henry litigation as the Ochses' damages in its negligence action against ESTC.

This Court has stated that "[d]ecisions concerning the award of counsel fees rest solely in the discretion of the trial judge." *Petrini v. Petrini*, 336 Md. 453, 468 (1994) (citing *Jackson v. Jackson*, 272 Md. 107, 111-12 (1974)). "The trial court's determination of the reasonableness of attorney's fees is a factual determination within the sound

27

discretion of the court, and will not be overturned unless clearly erroneous." *Myers v.*

*Kayhoe*, 391 Md. 188, 207 (2006). Thus, "[a]n award of attorney's fees will not be reversed

unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong."

*Petrini*, 336 Md. at 468 (citing *Danziger v. Danziger*, 208 Md. 469, 475 (1955)).

The collateral litigation doctrine permits the court to award as damages the legal

fees from the separate litigation. *See Empire Realty Co.*, 269 Md. at 286. As explained by

the Supreme Court of Colorado,

> [L]itigation expenses and attorneys' fees incurred by a party in one case may,
> in certain circumstances be an appropriate measure of damages against a
> third party in a subsequent action. . . . "[W]hen the natural and probable
> consequence of a wrongful act has been to involve [a] plaintiff in litigation
> with others, the general rule is that the reasonable expenses of the litigation
> may be recovered from the wrongdoer."

*Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1071 (Colo. 2010)

(second alteration in original) (citations omitted). The doctrine applies when the plaintiff

is "placed in a position of having to bring suit as plaintiff to defend his rights." *Id.* (quoting

*Elijah v. Fender*, 674 P.2d 946, 951 (Colo. 1984)).

> The doctrine does not establish a stand-alone cause of action, nor is it an
> exception to the so-called American [R]ule that parties are responsible for
> their own litigation costs and fees. Rather, the doctrine is but an
> acknowledgement that the litigation costs incurred by a party in separate
> litigation may sometimes be an appropriate measure of **compensatory
> damages** against another party.

*Id.* (emphasis added) (footnotes and citations omitted).

The Restatement (Second) of Torts defines "compensatory damages" as "the

damages awarded to a person as compensation, indemnity or restitution for harm sustained

by him." Restatement (Second) of Torts § 903 (Am. Law Inst. 1979).[23] Compensatory damages can be divided into "economic" and "noneconomic damages." The Restatement notes that "[c]ompensatory damages that will not be awarded without proof of pecuniary loss[, i.e. economic damages,] include compensation for (a) harm to property, (b) harm to earning capacity, and (c) the creation of liabilities." *Id.* at § 906. In contrast, "[c]ompensatory damages that may be awarded without proof of pecuniary loss[, i.e. noneconomic damages,] include compensation (a) for bodily harm, and (b) for emotional distress." *Id.* at § 905.

In this case, the Ochses sought both economic and noneconomic compensatory damages in their negligence action against ESTC. The trial court found that the Ochses were not entitled to noneconomic damages, and the Ochses do not contest that finding on appeal. However, regarding the economic damages, the Ochses assert that the trial court should have independently computed the attorney's fees incurred in the Henry litigation based upon the evidence submitted by the Ochses in this case.

The trial court calculated the Ochses' economic damages against ESTC by taking judicial notice of the amount of attorney's fees awarded by the circuit court in the Henry litigation:

---

[23] Compensatory damages are in contrast to "nominal damages," which are defined as "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages," Restatement (Second) of Torts § 907, and "punitive damages," which are defined as "damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908.

With respect to economic damages, while the Ochses argue that this Court should not consider the judgment of $215,710.60, this Court believes it must do so.  Recognizing that the case is on appeal, the Circuit Court for Dorchester County determined this amount to be the amount to which the Ochses were entitled for the Henry litigation.  Consequently, judgment in the amount of $215,710.60 will be entered against ESTC and in favor of the Ochses on the negligence and breach of contract counts.

Maryland Rule 5-201 permits trial judges to take judicial notice[24] of adjudicative

---

[24] Maryland Rule 5-201 states:

(a) Scope of Rule.  This Rule governs only judicial notice of adjudicative facts.  Sections (d), (e), and (g) of this Rule do not apply in the Court of Special Appeals or the Court of Appeals.

(b) Kinds of facts.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary.  A court may take judicial notice, whether requested or not.

(d) When mandatory.  A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard.  Upon timely request, a party is entitled to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice.  Judicial notice may be taken at any stage of the proceeding.

(g) Instructing jury.  The court shall instruct the jury to accept as conclusive any fact judicially noticed, except that in a criminal action, the court shall instruct the jury that it may, but is not required to, accept as conclusive any judicially noticed fact adverse to the accused.

facts.[25]  This Court has stated, "Judicial discretion has been defined as 'that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing statute or rule[.]'"  *Dashiell v. Meeks*, 396 Md. 149, 177 (2006) (quoting *Jenkins v. College Park*, 379 Md. 142, 164 (2003)).  In other words, "judicial discretion 'is defined as the power of a court to determine a question upon fair judicial consideration with regard to what is right and equitable under the law and directed by reason and conscience to a just result.'"  *Id.* (quoting *Schneider v. Hawkins*, 179 Md. 21, 25 (1940)).

In reviewing a trial court's exercise of judicial discretion, this Court will not find an abuse of discretion unless there is a "showing that a court acted in a harsh, unjust, capricious and arbitrary way."  *Id.* at 178.  There was no such showing here.  Both parties stipulated to the admission of the entire Henry litigation.  The record includes all of the documents up to and including the petition for a writ of certiorari to this Court after the first appeal.  One of the few documents missing from the record of the Henry litigation was the trial court's order and opinion awarding the Ochses attorney's fees after this Court denied the petition.  Therefore, the trial court did not abuse its discretion by taking judicial notice of the Henry litigation attorney's fees or by calculating the Ochses' damages as equivalent to the reasonable attorney's fees awarded in the Henry litigation.

---

[25] An adjudicative fact is a fact "about the parties and their activities, businesses and properties.  They usually answer the questions of who did what, where, when, how, why, with what motive or intent[.]"  *Dashiell v. Meeks*, 396 Md. 149, 175 n.6 (2006) (quoting *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711-12 (1977)).

31

Next, we address the Ochses' argument that the trial court should have used the "lodestar method" of calculating attorney's fees. The lodestar method is a method of calculating attorney's fees by "multiplying the number of hours reasonably spent pursuing a legal matter by a 'reasonable hourly rate' for the type of work performed." *Monmouth Meadows Homeowners Ass'n v. Hamilton*, 416 Md. 325, 333 (2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), *abrogated in part on other grounds*, *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002)). "This amount is then adjusted by the court, depending on the effect of numerous external factors bearing on the litigation as a whole." *Id.* The lodestar method is not used for all attorney's fees awards and is "generally appropriate in the context of fee-shifting statutes." *Id.* at 334. The lodestar approach has public policy goals and "is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that other methods would provide inadequate compensation." *Id.* at 334-35 (quoting *Krell v. Prudential Life Ins. Co. of Am.*, 148 F.3d 283, 333 (3d Cir. 1998)).

The Henry litigation did not involve a fee-shifting statute, and therefore the lodestar method of calculation would not be appropriate. *See id.* at 335. The litigation arose from a dispute between private parties concerning a breach of contract, and does not represent a substantial threat to the public interest that would justify the application of the lodestar method. *See id.* at 335-36. Although the Contract of Sale did contain its own fee-shifting provision, the public policy underlying the use of the lodestar method in cases involving fee-shifting statutes is inapplicable to a fee-shifting provision contained within a real estate

contract between private parties. Therefore, the trial court properly declined to use the lodestar method.

Furthermore, because the collateral litigation doctrine requires the plaintiff to establish that the fees and expenses from the first litigation were incurred necessarily and in good faith, it was appropriate for the trial court to limit the Ochses' damages to the amount of attorney's fees awarded by the circuit court in the Henry litigation, rather than engage in its own independent calculation. In the Henry litigation, the circuit court used the "proportionate award" approach to arrive at what it determined to be a reasonable fee, and entered judgment accordingly against the Henrys. Although the Ochses asked for a greater amount, the circuit court determined that those additional fees were not reasonable. In this collateral litigation action, the Ochses essentially attempt to relitigate this point— whether the fees awarded in the Henry litigation were reasonable. We decline to second guess the reasonableness of attorney's fees awarded in the Henry litigation when the Ochses have already argued this issue in their second appeal to the Court of Special Appeals, and we denied a request to grant a petition for certiorari from that appeal. *See Ochse 2*, 216 Md. App. at 449, *cert. denied*, 439 Md. 331 (2014). Because the circuit court in the Henry litigation determined that the additional fees requested by the Ochses, beyond those that it awarded, were unreasonable, it follows that those fees were not "incurred necessarily." Therefore, it was appropriate for the trial court in this case to limit its calculation of damages to the attorney's fees awarded by the circuit court in the Henry litigation, because any other fees requested by the Ochses had already been declared unreasonable, and thus not "incurred necessarily."

33

The Court of Special Appeals remanded this case to the trial court to clarify whether the Ochses' damages were awarded for ESTC's negligence or breach of contract. However, the trial court found that the contract gave rise to the tort "duty to[] accurately and completely report the state of the title in the property the Ochses were undertaking to purchase." It is clear from the record that the attorney's fees were awarded pursuant to the negligence action, the duty of which arose from the contract. This is supported by the trial court's conclusion that the attorney's fees were awarded for both the negligence and breach of contract action. As we stated in *100 Investment Ltd. Partnership*, "It is a settled and 'familiar proposition that not every duty assumed by contract will sustain an action sounding in tort.'" 430 Md. at 212 (quoting *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252 (1999)). "There are situations, however, when responsibilities imposed by a contractual relationship are supplemented with tort duties." *Id.* (citing *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534 (1986)). Thus, a plaintiff can recover "in tort for economic losses caused by the negligent services of a professional." *Id.* at 228 (quoting *Columbia Town Ctr. Title Co. v. 100 Inv. Ltd. P'ship*, 203 Md. App. 61, 105 (2012) (Meredith, J., dissenting), *rev'd*, 430 Md. 197 (2013)).

Therefore, we conclude that the trial court properly calculated the damages on the Ochses' negligence claim by taking judicial notice of the attorney's fees incurred necessarily and awarded by the circuit court in the Henry litigation, rather than independently calculating the attorney's fees based on the evidence submitted by the Ochses.

### D. *Collateral Source Rule*

Finally, we must decide whether the collateral source rule applies in this case. The trial court reduced the Ochses' damages by the amount satisfied by the Henrys in the Henry litigation. If the collateral source rule applies, then the trial court was not permitted to consider the Henrys' satisfaction of the attorney's fees in its award of damages to the Ochses. But if the collateral source rule does not apply, and the trial court was permitted to consider the Henrys' satisfaction, then the Ochses would be unable to establish one of the elements of the collateral litigation doctrine—namely, that their litigation expenses were "incurred necessarily"—and thus the Ochses would be unable to recover.

The Ochses assert that the trial court was not permitted to consider the Henrys' satisfaction because the Henrys are a collateral source and the collateral source rule precluded ESTC from presenting evidence of the Henrys' satisfaction to offset ESTC's liability in the instant case. As a result, the Ochses contend that the trial court erred by reducing the Ochses' damages by the amount of attorney's fees satisfied by the Henrys in the Henry litigation. ESTC responds that the collateral source rule does not apply because the Restatement (Second) of Torts limits collateral sources to four types of benefits received by a plaintiff—insurance policies, employment benefits, gratuities, and social legislation benefits. *See* Restatement (Second) of Torts § 920A, cmt. c. ESTC contends that the list in the Restatement is exhaustive, and the payment of attorney's fees is not listed.

The Maryland Association for Justice, Inc. ("MAJ") submitted an amicus brief that disputes ESTC's contentions. MAJ states that ESTC's position would carve out the first

exception to the collateral source rule. MAJ asserts that attorney's fees fall within the ambit of the collateral source rule, and that Maryland law allows tort victims to receive any potential windfall.

"[T]he collateral source rule has been applied in this State to permit an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Siedel Chevrolet, Inc.*, 326 Md. 237, 253 (1992). The collateral source rule is an English common law rule, *Narayen v. Bailey*, 130 Md. App. 458, 466 (2000), and can be traced back in American jurisprudence to the United States Supreme Court's decision in *Propeller Monticello v. Mollison*, 58 U.S. 152 (1854). In *Mollison*, the tortfeasor asserted that it was not liable for damages because the plaintiff received satisfaction from its insurer. *Mollison*, 58 U.S. at 155. The Supreme Court held that the tortfeasor could not avail itself of the insurance compensation because "[t]he contract with the insurer [was] in the nature of a wager between third parties, with which the [tortfeasor] ha[d] no concern." *Id.* Thus, the collateral source rule "permits an injured person to recover the full amount of his or her provable damages, 'regardless of the amount of compensation which the person has received from his or her injuries from sources unrelated to the tortfeasor.'" *Lockshin v. Semsker*, 412 Md. 257, 285 (2010) (quoting *Haischer v. CSX Transp., Inc.*, 381 Md. 119, 132 (2004)).

Maryland adopted the collateral source rule as early as 1899 in this Court's opinion in *Baltimore City Passenger Railway Co. v. Baer*, 90 Md. 97 (1899). *See Motor Vehicle Admin.*, 326 Md. at 253-54 (tracing the history of the collateral source rule). In *Baltimore*

36

*City Passenger Railway Co.*, the Court stated that "sick benefits received by the plaintiff from any source other than the defendant were not to be considered by the jury in making up their verdict." *Balt. City Passenger Ry. Co.*, 90 Md. at 108.

In Maryland, the collateral source rule "generally prohibits presentation to a jury of evidence of the amount of medical expenses that have been or will be paid by health insurance." *Lockshin*, 412 Md. at 285 (citing *Haischer*, 381 Md. at 132). "The purpose of the Collateral Source Rule is to preserve an injured party's right to seek tort recovery from a tortfeasor without jeopardizing his or her right to receive insurance payments for medical care." *Narayen*, 130 Md. App. at 466 (citing Michael F. Flynn, *Private Medical Insurance & the Collateral Source Rule: A Good Bet?*, 22 U. Tol. L. Rev. 39, 41 (1990)). The policy underlying the collateral source rule is to encourage "the maintenance of insurance." *Haischer*, 381 Md. at 132. Hence, the rule prevents a defendant from receiving the benefit of a plaintiff's insurance, for which the plaintiff paid consideration through premiums. This Court has also barred evidence of disability and retirement benefits pursuant to the collateral source rule. *See CSX Transp., Inc. v. Pitts*, 430 Md. 431, 473 (2013) ("[T]he collateral source rule bars evidence of disability and retirement benefits[.]").

However, the collateral source rule is not an absolute bar to the admissibility of evidence demonstrating payment by a third party. The rule is applicable to tort cases and is generally not applied in contract cases. *Dennison v. Head Constr. Co.*, 54 Md. App. 310, 321-22 (1983) ("[The collateral source rule] has generally been applied only to tort cases."); *see also Kremen v. Md. Auto. Ins. Fund*, 363 Md. 663, 671-72 (2001); *Seidel Chevrolet, Inc.*, 326 Md. at 253 ("[M]ost courts have restricted application of the [collateral

37

source] rule to tort litigation[.]"). Additionally, the Restatement (Second) of Torts § 920A(c) limits the collateral source rule to four types of benefits:

> The rule that collateral benefits are not subtracted from the plaintiff's recovery applies to the following types of benefits:
>
> (1) Insurance policies, whether maintained by the plaintiff or a third party. Sometimes, as in fire insurance or collision automobile insurance, the insurance company is subrogated to the rights of the third party. This additional reason for keeping the tortfeasor's liability alive is not necessary, however, as the rule applies to insurance not involving subrogation, such as life or health policies.
>
> (2) Employment benefits. These may be gratuitous, as in the case in which the employer, although not legally required to do so, continues to pay the employee's wages during his incapacity. They may also be benefits arising out of the employment contract or a union contract. They may be benefits arising by statute, as in worker's compensation acts or the Federal Employers' Liability Act. Statutes may subrogate the employer to the right of the employee, or create a cause of action other than by subrogation.
>
> (3) Gratuities. This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services or the plaintiff was treated in a veterans['] hospital does not prevent his recovery for the reasonable value of the services.
>
> (4) Social legislation benefits. Social security benefits, welfare payments, pensions under special retirement acts, all are subject to the collateral-source rule.

The Ochses contend that the collateral source rule should apply to this case. However, they do not cite any authority for the proposition that a fee-shifting provision in a real estate sales contract is analogous to the collateral benefits listed in the Restatement. Furthermore, the circumstances of this case are distinct from the insurance context, where application of the collateral source rule normally prevents a defendant from receiving the benefit of a plaintiff's insurance for which the plaintiff paid consideration through premiums. In this case, application of the collateral source rule would be inappropriate

38

because the Ochses did not pay separate consideration for the fee-shifting provision in their Contract of Sale with the Henrys.

Therefore, we decline to extend the collateral source rule, which would preclude the consideration of the Henrys' satisfaction of the same damages that the Ochses sought to recover in the instant case from ESTC. The collateral litigation doctrine only permits the recovery of attorney's fees actually incurred. Thus, the trial court did not err by considering the satisfaction of the attorney's fees by the Henrys pursuant to the fee-shifting provision in the Contract of Sale. If the Henrys had not satisfied the attorney's fees pursuant to the fee-shifting provision in the Contract of Sale, then the Ochses' theory of damages would have sufficed. But, the Ochses cannot take advantage of the fee-shifting provision in the Contract of Sale and of the collateral litigation doctrine to recover the same attorney's fees. "The object of tort law is to, so far as possible with money, place the injured party in the position he would have been if no tort had been committed. It is to provide full recompense but nothing more." *Paducah Area Pub. Library v. Terry*, 655 S.W.2d 19, 23 (Ky. 1983). In this case, the Ochses would be in a much better position than they were prior to ESTC's negligent title search if they were permitted to recover the attorney's fees that have already been satisfied.

We hold that the trial court properly declined to apply the collateral source rule in this case, and did not err by reducing the damages awarded to the Ochses by the amount previously satisfied by the Henrys. The Henrys' satisfaction of the attorney's fees from the Henry litigation eliminated the Ochses' injury, because the fees were not "incurred necessarily." Accordingly, the Ochses are unable to establish one of the basic elements of

39

a negligence cause of action: "that the plaintiff suffered actual injury or loss." *Kirson*, 439 Md. at 523-24 (quoting *Taylor*, 207 Md. App. at 148). The Ochses would have been permitted to recover the attorney's fees as damages in this collateral litigation action against ESTC but for the fee-shifting provision in the Contract of Sale and the Henrys' satisfaction of the attorney's fees pursuant to that provision. In other words, if the Henrys had not satisfied the judgment for attorney's fees in the Henry litigation, ESTC would have remained liable, under the collateral litigation doctrine, for the fees awarded in that litigation.

**III**
**Conclusion**

For the reasons set forth above, we hold that a party may recover attorney's fees actually incurred, as damages, pursuant to the collateral litigation doctrine, when the expenses were the proximate result of the complained-of injury, incurred necessarily and in good faith, and the amount is reasonable. However, the plaintiff has the burden in any negligence action to demonstrate actual injury. If a plaintiff seeks to recover attorney's fees as damages pursuant to the collateral litigation doctrine, then the plaintiff must demonstrate that he or she actually incurred the attorney's fees. In this case, the Ochses

did not incur the attorney's fees because the Henrys satisfied the attorney's fees pursuant to the fee-shifting provision in the Maryland Residential Contract of Sale.

Therefore, we reverse the judgment of the Court of Special Appeals and reinstate the trial court's order with respect to the judgment concerning ESTC.[26]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REINSTATE THE JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY. COSTS TO BE PAID BY RESPONDENTS/CROSS-PETITIONERS.**

---

[26] As we noted above, Chicago Title is not a party to this appeal, and we express no opinion as to the correctness of the trial court's order with respect to that party.